# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA    ) | |
| ) | |
| vs.                          ) | **PRESENTENCE INVESTIGATION REPORT** |
| ) | |
| ) | **Docket No.:**    3:17CR01028-025-BTM |
| PITTS, Bradley Scott         ) | |
| ) | |

**Prepared for:**       The Honorable Barry Ted Moskowitz
                        Chief U.S. District Judge

**Prepared by:**        Jessica C. Hood
                        U.S. Probation Officer
                        San Diego, CA
                        (619) 557-5246
                        jessica_hood@casp.uscourts.gov

**Assistant U.S. Attorney**                **Defense Counsel** (appointed)
Janaki S. Gandhi                           Keith Howard Rutman
880 Front Street, Room 6293                501 West Broadway, Suite 1650
San Diego, CA 92101                        San Diego, CA 92101-3541
(619) 546-8817                             (619) 237-9072
Janaki.Gandhi@usdoj.gov                    krutman@krutmanlaw.com

Matthew James Sutton
(619) 546-8941
Matthew.Sutton@usdoj.gov

Jarad E. Hodes
(619) 546-7432
Jarad.Hodes@usdoj.gov

**Sentence Date:**       January 12, 2018, at 10:30 A.M.

**Offense:**             21 U.S.C. §§ 843(b) Unlawful Use of a Communication Facility, a Class
                         E felony.

**Penalty**              4 years' imprisonment; 1 year supervised release; $250,000 fine; and a
                         $100 special assessment.

**Arrest Date:**         April 26, 2017

**Release Status:**      6/8/2017: Released on $20,000 P/S bond; 44 days presentence custody
                         served.

PITTS, Bradley Scott                                                                           2

**Codefendants:**
01) QUARLES, Jr., John Albert: Sentencing set for 1/17/18.
02) ESTRADA, Jr., Jose Pedro: Change of plea set for 12/5/17.
03) JOHNSON, Tyrone Lorenzo: Jury trial set for 3/5/18.
04) BROWN, Walter: Jury trial set for 3/5/18.
05) EVANS, Ricky: Sentencing set for 1/19/18.
06) LEAUV, Kimsay Dennis: Jury trial set for 3/5/18.
07) MCGUIRE, Jarrett: Sentencing set for 2/16/18.
08) HEARD, Patrick: Case dismissed 11/13/17.
09) XAYPANYA, Kitsana: Sentencing set for 1/10/18.
10) HEMPSTEAD, Merrell Cedric: Sentencing set for 1/12/18.
11) WOODS, Earl: Jury trial set for 3/5/18.
12) ADAMS, Thomas: Jury trial set for 3/5/18.
13) RUSSELL, Glen: Jury trial set for 3/5/18.
14) JONES, Timothy: Sentencing set for 12/20/17.
15) ELLIOT, Michael: Jury trial set for 3/5/18.
16) JEFFREY, Paul Joseph: Jury trial set for 3/5/18.
17) LASTER, Andrew: Sentencing set for 12/20/17.
18) LANKFORD, James: Sentencing set for 12/8/17.
19) OLIVER, Curtis Clyde: Jury trial set for 3/5/18.
20) CUNNINGHAM, Kimberly Evette: Status set for 11/15/18.
21) KNIGHT, Darren Dimitri: Sentencing set for 12/8/17.
22) APPLEWHITE, Phylicia Renee: Jury trial set for 3/5/18.
23) BLACKWELL, Raymond: Sentencing set for 2/16/18.
24) VIELMA-Rodriguez, Pablo: Sentencing set for 12/8/17.
25) PITTS, Bradley Scott: Sentencing set for 1/12/18.

**elated Cases:**   *17CR01026-BTM*

01) Chounlaboudy, Soulidao: Sentencing set for 1/19/18.
02) Chounlaboudy, Solideuane: Sentencing set for 1/17/18.
03) Herrera, Johnny: Sentencing set for 12/15/17.
04) Anderson, Elizabeth Ashley: Sentencing set for 1/12/18.
05) Contreras-Ramirez, Ruben: Sentencing set for 12/15/17.
06) Moates, II, Anthony Eric: Sentencing set for 12/1/17.
07) Muldrow, Larry: Sentencing set for 12/8/17.
08) Hill, Naomi Jean: Sentencing set for 12/1/17.

*17CR01027-BTM*

01) Quarles, Jr., John Albert: Sentencing set for 1/17/18.
02) Ford, Antwaun: Sentencing set for 1/19/18.
03) Pollard, Jr., Don Vester: Sentenced to time served (129 days) and
        2 years of supervised release on 9/8/17.

PITTS, Bradley Scott                                                                                        3

_17CR01276-W_

   01) Mercado, Della Guadalupe: Sentenced to 46 months' custody and
        3 years of supervised release on 11/16/17.
   02) Thompson, Christina: Sentenced to 46 months' custody and 3
        years of supervised release on 9/5/17.

_17CR00981-DMS_

   01) Lea, Charles: Sentencing set for 2/2/18.

PITTS, Bradley Scott                                                                                                  4

___

**Identifying Data:**



| | |
|---|---|
| **Date of Birth:** | March 14, 1969 |
| **Age:** | 48 |
| **Race:** | Black or African American |
| **Hispanic Origin:** | Non-Hispanic origin |
| **Sex:** | Male |
| **Eye Color:** | Brown |
| **Hair Color:** | Black |
| **Height:** | 6ft. 0in. |
| **Weight:** | 220 lbs. |

| | |
|---|---|
| **SSN#:** | 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 |
| **FBI#:** | 764637HA6 |
| **USM#:** | 61145-298 |
| **CII#:** | CA 08639106 |
| **CA/DL#:** | A8910625 (valid) |
| **PACTS#:** | 3531043 |

| | |
|---|---|
| **Education:** | High School Diploma |
| **Citizenship:** | U.S. Citizen |
| **Country of Birth:** | United States |
| **Place of Birth:** | Union Town, Pennsylvania |

| | |
|---|---|
| **Current Address:** | 425 North D Street |
| | Westmorland, California 92281 |

| | |
|---|---|
| **Legal Residence:** | Same as above |

| | |
|---|---|
| **Alias(es):** | Hall, Bradley |
| | Pitts, Bradley |
| | Scott, Bradley Pitts |

| | |
|---|---|
| **Alternate IDs:** | CDCR: AM6465 |
| | State ID: MO00804404 |
| | SSN: 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 |

---

*Restrictions on Use and Redisclosure of Presentence Investigation Report*. Disclosure of this presentence investigation report to the Federal Bureau of Prisons and redisclosure by the Bureau of Prisons is authorized by the United States District Court solely to assist administering the offender's prison sentence (i.e., classification, designation, programming, sentence calculation, pre-release planning, escape apprehension, prison disturbance response, sentence commutation, or pardon) and other limited purposes, including deportation proceedings and federal investigations directly related to terrorist activities. If this presentence investigation report is redisclosed by the Federal Bureau of Prisons upon completion of its sentence administration function, the report must be returned to the Federal Bureau of Prisons or destroyed. It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.

---

**This presentence report has taken into consideration the statutory factors listed at 18 U.S.C. § 3553(a) and the advisory sentencing guidelines.**

## PART A. THE OFFENSE

### Charge(s) and Conviction(s)

1. On April 21, 2017, a five-count indictment was filed in the Southern District of California, variously charging the defendants listed on page 2 in Count One with 21 U.S.C. §§ 841(a)(1) and 846, Conspiracy to Distribute Methamphetamine; in Counts Two and Three with 18 U.S.C. § 922(g)(1), Felon in Possession of a Firearm and Ammunition; in Count Four with 21 U.S.C. § 841(a)(1), Possession of Methamphetamine with Intent to Distribute; and in Count Five with 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, Possession of Methamphetamine and Cocaine Base with Intent to Distribute and Aiding and Abetting.  A forfeiture allegation was also made pursuant to 21 U.S.C. §§ 853, 18 U.S.C. § 924(d)(1), and 28 U.S.C. § 2461(c).

2. On June 8, 2017, a one-count superseding information was filed, charging Bradley Scott PITTS with a violation of 21 U.S.C. § 843(b), Unlawful Use of a Communication Facility.  A forfeiture allegation was also made pursuant to 21 U.S.C. § 853.  On the same day, the defendant pled guilty and consented to the forfeiture allegation.

### The Offense Conduct

3. The following information was gathered from discovery materials provided by the United States Attorney's Office.  Additionally, the undersigned met with the Assistant United States Attorney (AUSA) who provided an overview of the instant offense and related cases. Comments from the AUSA, defense counsel, and case agent are summarized below.

### *Background*

4. Operation Seeing Blue began in early 2016 and focused on methamphetamine, cocaine, and firearms trafficking by street gang members and associates, primarily the Oriental Mafia Crips (OMC), West Coast Crips (WCC), and Neighborhood Crips (NC) in San Diego, California. The investigation was led by Homeland Security Investigations (HSI), but involved multiple other agencies including the San Diego Police Department (SDPD), the Drug Enforcement Administration (DEA), the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) and the San Diego County District Attorney's Office (SDCDA).

5. In January 2016, agents began investigating the drug distribution activities of Soulidao Chounlaboudy, aka "Lazy," a high-value OMC gang member involved in drug trafficking (related case No. 17CR01026-BTM). Through this investigation, agents identified QUARLES, aka "J-Money," and numerous other gang members (charged in related cases) as methamphetamine sources of supply for Chounlaboudy. Beginning in October 2016 and through February 2017, agents monitored various telephones utilized by QUARLES. Through electronic and wire intercepts agents confirmed that QUARLES

distributed large quantities of methamphetamine and smaller amounts of cocaine to fellow gang members and associates.

6.    During the course of intercepts, agents identified ESTRADA, Jr., aka "Boy" and LEAUV, aka "Gangster," as QUARLES' methamphetamine sources of supply. Agents also identified Antwaun Ford, aka "Ant" as QUARLES' cocaine source of supply and Don Vester Pollard Jr., as a cocaine sub-distributor (both charged in related case No. 17CR01027-BTM). The following gang members and associates were identified as ounce-quantity methamphetamine sub-distributers for QUARLES: JOHNSON, aka "T-Ro;" BROWN, aka "Pee Wee;" EVANS, aka "Sweets;" MCGUIRE aka "Blue Jay;" HEARD aka "Ace;" XAYPANYA aka "Kelly;" HEMPSTEAD aka "Popo;" WOODS aka "Meech;" ADAMS; RUSSELL aka "G-Rock;" JONES; ELLIOT, aka "Black;" JEFFREY; LASTER; LANKFORD aka "Smiley;" OLIVER; KNIGHT; BLACKWELL aka "Black Dog;" and VIELMA-RODRIGUEZ aka "Acapulco."

7.    Agents identified CUNNINGHAM as the principal money launderer for QUARLES as she coordinated the collection of his narcotics proceeds.

8.    PITTS was involved in a September 2016 narcotic transaction with Chounlaboudy and QUARLES.

9.    APPLEWHITE was involved in a November 2016 narcotic transaction with QUARLES and JOHNSON.

10.    As a result of the investigation, investigators seized approximately 712.49 grams of methamphetamine (actual), 14.7 grams of cocaine base, and one firearm tied to the QUARLES drug distribution network.

*Culpability Assessment as to Dkt. No. 17CR01028-BTM*

11.    ESTRADA and LEAUV were sources of methamphetamine for QUARLES. QUARLES was a source of methamphetamine supply for Soulidao Chounlaboudy.

12.    JOHNSON, BROWN, EVANS, MCGUIRE, HEARD, XAYPANYA, HEMPSTEAD, WOODS, ADAMS, RUSSELL, JONES, ELLIOT, JEFFREY, LASTER, LANKFORD, OLIVER, BLACKWELL, AND VIELMA were independent drug dealers who purchased their methamphetamine from QUARLES.

13.    APPLEWHITE and PITTS were present during drug buys, but were not further involved in the offense.

14.    CUNNINGHAM handled QUARLES' money and KNIGHT was QUARLES' apprentice in the drug trade.

*Conduct Specific to PITTS*

15.   On September 1, 2016, agents intercepted calls between Chounlaboudy and QUARLES arranging for Chounlaboudy to purchase two ounces of methamphetamine from QUARLES.   Thereafter, agents conducted surveillance of the narcotic transaction. Chounlaboudy approached QUARLES who was standing next to a vehicle.   QUARLES handed Chounlaboudy a plastic bag containing a white substance.   In return, Chounlaboudy handed PITTS, who was a passenger in the vehicle, $650.  Chounlaboudy then returned to his vehicle and provided the drugs to a person working in an undercover capacity.  Both vehicles then left the area.

16.   Subsequent lab analysis by the Drug Enforcement Agency (DEA) confirmed the package supplied to Chounlaboudy by QUARLES and PITTS contained 55.2 grams of methamphetamine (actual).

17.   On November 7, 2016, investigators intercepted a telephone conversation between QUARLES and PITTS in which they discussed PITTS purchasing $20 worth of marijuana from QUARLES.   Subsequent calls indicate PITTS went to QUARLES residence to complete the transaction.

18.   On November 30, 2016, investigators intercepted a telephone conversation between PITTS and QUARLES.   During this call they engaged in small talk about a shared acquaintance and PITTS informed QUARLES that was recently fired from his job after an altercation with another employee.   PITTS said he had been staying in local motels and that he was selling his prescription medication to support himself.   Specifically, PITTS stated, "I'm slinging these motherfucking pills for nine hundred ($900)." QUARLES asks about purchasing a "bottle," but it does not appear they discussed the issue further.

*Arrest of PITTS*

19.   On April 26, 2017, PITTS was arrested on the warrant issued in this case.  Post arrest, the defendant stated that the money provided to him by Chounlaboudy during the September 1, 2016, narcotic transaction did not belong to him, but instead belonged to QUARLES. It does not appear PITTS was questioned about specific details of the offense.

*Comments from the AUSA, Defense Counsel, and Case Agent*

20.   The AUSA informed that PITTS was present during a controlled purchase between Chounlaboudy and QUARLES as outlined above.   During this transaction, Chounlaboudy provided PITTS with the money for QUARLES. Otherwise he offered no additional comments pertaining to the offense.

21.   Defense counsel noted that PITTS was "number 25 on the indictment" and if he was not with QUARLES on the date of the September 1, 2016, narcotic transaction, "He wouldn't be here."  He added that PITTS was one of the first defendants to plead guilty and in light of the nature of the defendant's involvement in the instant case, the government "offered

a phone count and is recommending a low sentence." Counsel opined that a probation sentence is appropriate in this case.

22.    The case agent informed that PITTS "accompanied QUARLES on a two ounce meth purchase we made from Chounlaboudy utilizing a UC. PITTS took the money from Chounlaboudy and QUARLES provided the two ounces of meth. That was his (PITTS') only interaction in this case." Otherwise he offered no additional comments to include.

**Pretrial Supervision Adjustment**

23.    PITTS has been supervised by U.S. Pretrial Services (PTS) in the Southern District of California since his release on a $20,000 bond on June 8, 2017. The conditions of his release include: travel restrictions, residing at an approved residence, maintaining employment and/or being enrolled in school, and abstaining from use of any controlled substance.

24.    On September 4, 2017, PITTS was cited by an officer in Westmoreland, California, for not having front license plates and no proof of insurance. He failed to immediately report this law enforcement contact to his PTS officer, as directed (allegation one). More so, during this law enforcement contact the defendant stated that he had been living in Westmoreland which he had failed to report to his PTS officer (allegation two). On September 21, 2017, PITTS appeared before the Court for an Order to Show Cause hearing. At this hearing he admitted both allegations and the Court continued the defendant on pretrial release.

25.    The PTS officer completed a home inspection on October 2, 2017, where PITTS resides with his girlfriend Jacqueline Silva and her teenage daughter. There is a German Shepard at the property, but otherwise no hazards or concerns were noted.

**Defendant's Statement of the Offense**

26.    On September 28, 2017, the defendant was interviewed at the U.S. Probation Office in San Diego, California. The interview was conducted in the English language in the presence of defense counsel.

27.    PITTS agreed to discuss the offense. Regarding the September 1, 2016, narcotic transaction, the defendant informed that he was "hanging out with him (QUARLES) and he asked me to come with him to pick up some money." PITTS knew QUARLES was involved in drug sales, but did not know what they were picking up money for or that "drugs were being sold" during that meeting.

28.    As for the November 7, 2016, telephone conversation, PITTS informed that he called QUARLES after "someone asked me to get weed." During the November 30, 2016, phone call, the defendant told QUARLES that he was "slinging pills for extra money." PITTS affirmed that he was selling his prescribed pain medication for extra income.

29.    PITTS attributed his involvement in the instant case to those he chose to associate with. He has known QUARLES for over eight years and they met through PITTS' God

brother. The defendant considers QUARLES a friend. Still, he stated "I'm angry at myself for associating with a person like that." When asked why he continued to associate with QUARLES despite knowing that QUARLES was involved in drug sales, PITTS stated, "I always thought that if we were stopped, he (QUARLES) would accept responsibility because I wasn't involved."

30. The defendant further stated that the case herein has "impacted my life very dramatically. I was doing well on parole and had planned to leave California once off parole to start a new life." PITTS added, "I kick myself every day. I am embarrassed because I let down myself and my family. I want to put this behind me and move on to something better. I am at the age that I want to relax and enjoy life and be free."

31. PITTS would like the Court to know, "I am not a bad person. I am a loving and caring person. I made mistakes in my life and was trying to be better. I made the wrong choices by my associations (with others). I made it off parole with no issues. They discharged me with this federal case pending. I take my freedom very seriously. I ask (Your Honor) to consider probation. I am a good candidate and I want to succeed."

## Offense Level Computation

32. The 2016 Guidelines Manual, incorporating all guideline amendments, was used to determine the defendant's offense level. USSG §1B1.11.

33. Pursuant to USSG §1B1.3, Relevant Conduct, the defendant should be accountable for all acts he committed in the same course of conduct as the offense of conviction. In this case, PITTS was part of a narcotic transaction between Chounlaboudy and QUARLES involving 55.2 grams of methamphetamine (actual). As such, this amount was used when determining the base offense level.

### Count 1: Unlawful Use of a Communication Facility

34. **Base Offense Level:** The base offense level for Unlawful Use of a Communication Facility is found at USSG § 2D1.6, which states that the offense level is applicable to the underlying offense. In this matter, PITTS used a telephone in the commission of a controlled substance offense, namely to aid in the distribution of methamphetamine within the Southern District of California. In this case, pursuant to the relevant conduct provisions, PITTS is accountable for at least 55.2 grams of methamphetamine (actual). Therefore, pursuant to USSG § 2D1.1(c)(5), the base offense level is 30.          **30**

35. **Adjustment for Role in the Offense:** By all accounts, PITTS' role in the offense was minor. However, the defendant was afforded the opportunity to pled guilty to a lesser offense, which would generally negate a minor role adjustment per USSG § 3B1.2, comment. (n. 3-B). As such, no role adjustment is recommended.          **0**

36. **Adjusted Offense Level (Subtotal):**          **30**

37. **Acceptance of Responsibility:** The defendant has clearly demonstrated acceptance of responsibility for the offense. Accordingly, the offense level is decreased by two levels. USSG §3E1.1(a).  **-2**

38. **Acceptance of Responsibility:** The defendant has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty. Accordingly, the offense level is decreased by one additional level. USSG §3E1.1(b).  **-1**

39. **Total Offense Level:**  **27**

## PART B. THE DEFENDANT'S CRIMINAL HISTORY

40. Unless otherwise indicated, the defendant was represented by defense counsel or waived attorney representation for the following case(s).

### Sources of Information

41. Computer clearances were conducted through the FBI, CII, California Department of Motor Vehicles (DMV), courts and law enforcement agencies. Relevant documents were requested and are referenced for the following entries.

42. Additionally, information was gleaned from the probation report prepared in the San Diego Superior Court Case No. SCD194551, dated March 5, 2007, herein referred to as the 2007 PSR.

43. On the advice of counsel PITTS declined to discuss his criminal history in detail. However, he affirmed his 2005 arrest and subsequent kidnapping conviction.

### Juvenile Adjudication(s)

44. None known.

### Adult Criminal Conviction(s)

| | Date of Arrest | Charge/Agency | Date Sentence Imposed/Disposition | Guideline | Pts |
|---|---|---|---|---|---|
| 45. | 06/18/1995 (Age 26) | Ct. 1: PC415(3), Offensive Words in Public (misd.). La Mesa, CA PD | San Diego Co. Sup. Crt. (El Cajon), Docket No.: C171132 06/25/96: PG, 2 yrs. sum. prob. 07/25/97: Prob. revk'd, reinst. & mod. | 4A1.2(e)(3) | **0** |

| 46. | 11/15/1998 (Age 29) | Ct. 1: PC242/243(e)(1), Battery: Spouse (misd.). San Diego, CA PD | San Diego Co. Sup. Crt. (Central), Docket No.: M784126DV 10/20/00: PG, 2 yrs. sum. prob. 01/04/02: Prob. summ. revk'd, BWI. 02/19/02: Prob. revk'd, 180 days jail. | | **0** |

According to the 2007 PSR, this offense involved PITTS' ex-wife, Evelyn Cautivar.  No further details are known.

| 47. | 10/10/2005 (Age 37) | Ct. 1: PC594(a), Vandalism; Ct. 2: PC242/243(e)(1), Battery: Spouse (misd.) San Diego, CA PD | San Diego Co. Sup. Crt. (Central), Docket No.: M967726DV 02/09/07: PG Ct. 2. 03/05/07: Dispo. unk. | 4A1.1(c) | **1** |

Katrina Dugger, PITTS' girlfriend at the time, noticed that her television and stereo equipment were missing and kicked the defendant out of her residence. On October 8, 2005, PITTS went to the victim's residence asking for $50. The victim refused and PITTS struck her in the right side of her head.  The victim fell to the ground and when she looked up, she saw the defendant take her wallet and run from the residence. The defendant was subsequently arrested for this offense on October 10, 2005, after he returned to the victim's residence and attempted to kick in her front door.

Following the incident, Ms. Dugger filed two separate temporary restraining orders against PITTS.  He was served with the orders on October 13, 2005, and released on his own recognizance later that day.

| 48. | 10/14/2005 (Age 36) | Ct. 1: PC207(a), Kidnapping (fel.); Cts. 2-4: PC261(a)(2), Forcible Rape; Ct. 5: PC273.6(a), Disobeying a Court Order. San Diego, CA PD | San Diego Co. Sup. Crt. (Central), Docket No.: SCD194551 10/28/05: BWI. 09/13/06: Arrested. 01/03/07: PG Ct. 1. 03/05/07: 3 yrs. prob., 365 days jail. 05/30/08: Prob. revk'd, reinst. & mod., 25 days PSP. 03/13/09: FTA review hearing, BWI. 05/22/09: Prob. revk'd, reinst. & mod., 365 days | 4A1.1(a) and 4A1.2(k)(1) | **3** |

jail.
03/11/10: Prob. revk'd,
reinst. & mod., 365 days
jail.
11/21/11: Prob. summ.
revk'd, BWI.
10/10/12: Prob. revk'd, 5
yrs. prison.
07/15/15: Paroled.
08/13/17: Parole
discharged.

PITTS, in violation of a temporary restraining order served the day prior (see conviction above), contacted the victim, Katrina Dugger, while she waited at a bus stop.  The defendant forced the victim into his vehicle and told her he had a gun.  He said he would shoot her in the face and then kill himself.  The defendant drove the victim to Seaport Village where he raped the victim in his vehicle.  They then drove to a gas station and while the defendant was using a phone the victim attempted to flee.  PITTS grabbed her and forced her back to the vehicle.  The defendant demanded that the victim write a letter to his attorney stating that she had lied about the offense that occurred on October 8, 2005 (see above).  They drove to a Motel 6 where PITTS proceeded to rape the victim two more times.  After several hours, PITTS dropped the victim off at her residence.  He warned her not to call the police and "Do what I told you to do.  Don't make me come after you." The victim subsequently called the police who arrested PITTS at the Motel 6 without incident.  As the police escorted PITTS from the motel room he stated, "Did she call and tell you where I was?"  On the nightstand of the motel room was a small bag of marijuana.

Post-arrest PITTS told officers that he and the victim had been together for three years and shared two children.  Further, the victim was currently pregnant with their third child.  They lived together until he was recently arrested for domestic violence and vandalism.  They were having problems because the defendant was cheating on the victim.  PITTS admitted to making contact with the victim in violation of the restraining order, but denied that he had kidnapped or raped her.  Rather, they had consensual sex and she was making up her account of the offense to get back at him for cheating on her.

PITTS was released on October 19, 2005, but subsequently rearrested on September 13, 2006, following the issuance of a warrant.

Adjustment to Supervision:  As detailed above PITTS sustained numerous violations of his probation status due to failure to pay restitution, failure to enroll in and complete a 52-week domestic violence program, failure to seek and maintain employment, and failure to remain law abiding.  Ultimately, probation was revoked and PITTS was sentenced to state prison.  According to his parole agent, the defendant was compliant on parole and he was discharged from supervision without incident despite his arrest in the instant offense and pending adjudication.

| 49. | 08/25/2012 (Age 43) | Ct. 1: PC273.5(a), Corporal Injury to Spouse/Cohab. (misd.). Ct. 2: PC243(e)(1), Battery: Spouse. San Diego, CA PD | San Diego Co. Sup. Crt. (Central), Docket No.: M155049DV 10/10/12: PG Ct. 1, 365 days jail conc. Case SCD194551. | 4A1.1(b) | **2** |

Officers arrived to investigate a report of domestic violence. The victim, Cheryl Ann West, was PITTS' live-in girlfriend. She informed that the defendant became upset and grabbed her by her sweater causing her to trip and spill coffee on PITTS. The defendant responded by punching the victim in the back of the head and punching her left ear. The victim responded by throwing her coffee mug at PITTS. It was noted that the victim had noticeable bruising to her left ear.

### Criminal History Computation

50. The criminal conviction(s) listed above result(s) in six criminal history points.

51. The defendant committed the instant offense while under a criminal justice sentence (state parole) in Docket No(s). SCD194551; therefore, two points are added. USSG §4A1.1(d).

52. The total criminal history score is eight. According to the sentencing table in USSG Chapter 5, Part A, a criminal history score of eight establishes a criminal history category of IV.

### Other Criminal Conduct

53. On October 26, 1987, officers in San Diego responded to investigate a report of two stolen vehicles parked on the street. Upon arrival, both cars were gone and while patrolling the area officers observed PITTS driving one of the vehicles. He was subsequently arrested for the offense. Criminal charges were filed in San Diego Superior Court Case No. CR91703 and on February 24, 1988, PITTS pled guilty to receiving stolen property (felony). He was placed on three years of probation and ordered to serve 180 days in jail. On August 14, 2002, his plea was withdrawn, the conviction was set aside, and the matter was dismissed pursuant to California Penal Code § 1203.4.

54. On August 31, 2011, an officer in La Mesa, California, conducted a traffic stop on a vehicle driven by PITTS. Codefendant QUARLES was a passenger in the vehicle. A search of the vehicle recovered several small pill bottles containing marijuana (amount unknown). Inside a pair of shoes, officers located a larger pill bottle containing 96 *Oxycodone* pills. The label on the bottle showed the medication was prescribed to "Solomon Pitts," PITTS' brother. The defendant was arrested for the offense, but there were no charges filed.

PITTS, Bradley Scott                                                                                          14

### Other Arrests

55.   Between December 10, 1987, and May 29, 1997, PITTS was arrested by officers in San Diego and La Mesa for vehicle theft, battery, and damaging a power line.  Prosecution was declined in these matters.

56.   On May 30, 1992, the defendant was arrested by deputies in Clay County, Missouri, for passing a bad check.  It is noted that the offense occurred on January 27, 1992.  Charges were filed in Clay County Circuit Court, Case No. 7CR192001302, but the matter was ultimately dismissed by the state on July 21, 2014.

## PART C. OFFENDER CHARACTERISTICS

### Personal and Family Data

57.   The following biographical information was provided by the defendant during the presentence interview unless otherwise noted.  This officer reviewed the personal history information detailed in the 2007 PSR and noted no inconsistencies.

58.   Additionally, the undersigned attempted to speak with PITTS' sister-in-law Linda Pitts, but the number provided by the defendant was no longer in service.  The undersigned spoke with the defendant's sister and surety on his bond, Elizabeth Pitts, who corroborated much of his reported personal history.  Her comments are included where appropriate.

59.   The defendant was born in Union Town, Pennsylvania, to the married union of Solomon Pitts and Lovelee Pitts, both now deceased.  PITTS' father passed away in 1983 and the defendant was unsure of the cause.  According to the 2007 PSR, PITTS' father died from complications associated with sclerosis of the liver. The defendant's mother passed away from natural causes in 2016.

60.   PITTS identified the following siblings: Katherine Michalek (age 62), medically disabled (condition unknown) and residing in Santee, California; and Elizabeth Pitts (age 53), a laboratory assistant at Scripps Hospital residing in El Cajon, California.  Additionally, the defendant's brother, Solomon King David Pitts, passed away five years ago following a heart attack.  Solomon was married to Linda Pitts (age 53), whom the defendant likened to "a big sister."  Linda is disabled and resides in San Diego. The defendant described a close relationship with his family who are aware of his arrest herein and are supportive.

61.   The defendant described a satisfactory upbringing.  He was reared by both parents who were "very loving and caring."  He disavowed a history of abuse or neglect.  The defendant's sister noted that their father was "an alcoholic" who was frequently hospitalized or in jail for alcohol-related offense.  As such, they were primarily raised by their mother.  When PITTS was five years old his family moved from Union Town to San Pedro, California, for a few months.  They moved to San Diego when PITTS was six years old, where the defendant has remained since.  Prior to his arrest herein and immediately following his release on bond the defendant lived with his sister-in-law

Linda Pitts in San Diego.   In late September 2017 he moved to his girlfriend's (Jacqueline Silva's) residence in Westmoreland, California, where he remains to date.

62.     The defendant married Evelyn Cautivar in 1995.   They separated three years later, but have yet to legally divorce.   PITTS described their relationship as "very toxic" noting that Ms. Cautivar "called the police on me a lot and lied."   PITTS has not had contact with Ms. Cautivar in many years.   The undersigned notes that she is the victim in PITTS' 1998 battery case.   The defendant and Ms. Cautivar have two children from their union: Bradley Pitts Jr. (age 21) and Brandon Pitts (age 20).   PITTS described a close relationship with Bradley Jr., who resides in Chula Vista, California.   The defendant has not seen his son Brandon since 1998 and was unsure of his current whereabouts.

63.     Previously the defendant was in a five year relationship with Katrina Dugger.   It is noted that Ms. Dugger is the victim in PITTS' 2005 kidnapping case. They have two children from their union: Samuel Pitts (age 13) and Bella Pitts (age 10).   PITTS has not had contact with Ms. Dugger or his children in ten years and was unsure of their current whereabouts. It is noted that Ms. Dugger was pregnant at the time of the 2005 kidnapping offense.

64.     According to the 2007 PSR, PITTS and Ms. Dugger had a third child who was given up for adoption.   The defendant informed that they could not care for two children at the same time and opted to place the child up for adoption. Reportedly Ms. Dugger blamed PITTS for this decision and never forgave him.

65.     The defendant disavowed that he was court-ordered to pay child support.   However, according to the 2007 PSR he was ordered to pay $690 a month for his eldest children.

66.     The defendant was asked about his relationship with Cheryl West, the victim in his 2012 domestic violence case and PITTS informed that they casually dated.   No children were born from this relationship and PITTS has not had contact with Ms. West in several years.

67.     PITTS has been in a dating relationship with Jacqueline Silva (age unknown) for 11 months.   The defendant described a good relationship with Ms. Silva, a Lowe's home improvement store employee residing in Westmoreland.   She is aware of PITTS' arrest and is supportive.   As previously noted PITTS recently moved in with Ms. Silva.

68.     The defendant's sister, Elizabeth Pitts, informed that she and PITTS "don't talk much about his personal life and his children" so she was unable to comment on his past relationships.   However, she has met Ms. Silva who she noted "seems like a really nice lady."   Ms. Pitts was aware of the nature of PITTS' arrest, but was unsure why the defendant opted to get involved in the offense.   She did not offer any additional comments to include regarding the defendant's character noting, "We don't get to interact much."

69.     <u>Gang Affiliation</u>:  The instant case involves several individuals associated with various gangs in San Diego County. However, there is no indication PITTS himself is affiliated

with a criminal street gang.  During the probation interview the defendant disavowed being a member or associate of any gang.

### Physical Condition

70.     PITTS suffers from Degenerative Disc Disease (DDD).  An internet query shows that DDD is not actually disease, but rather a condition in which pain is caused from a damaged disc.  It can occur throughout the spine, but it most often seen in the discs in the lower back (lumbar region) and the neck (cervical region).  The condition can cause acute or chronic low back or neck pain as well as nerve pain.

71.     In 2006 PITTS had his first spinal surgery.  The same year he developed blood clots in his lungs.  To date he continues to take *Coumadin* (prescription blood thinner) to treat this condition.

72.     In 2015 the defendant was involved in a vehicle accident that aggravated his existing DDD symptoms.  He has been under the care of Dr. Moon with the Pain Care of San Diego and on September 9, 2017, underwent a spinal fusion surgery with Dr. Kim at the Alvarado Hospital Advance Spine Institute in San Diego.  At the time of the presentence interview PITTS was wearing a neck brace.  He continues to experience pain in his left arm and has muscle spasms in his neck.   PITTS is prescribed *Roxicodone* for pain management and *Valium* to control muscle spasms.  The defendant noted he may need additional spinal surgeries.

73.     Medical records were requested from Alvarado Hospital, but a response was awaited as of the submission of this report.  Correspondence received from Pain Care of San Diego detailed that PITTS is under the care of Dr. Michael Moon for "constant sharp neck pain with radicular symptoms to the right upper extremity."  The defendant reported a severe burning sensation in his forearms with intermittent numbness in his fingers.   A Supplemental Report dated September 8, 2017, details that PITTS had a "cervical fusion surgery" on September 6, 2017.  Further, PITTS is prescribed *Roxicodone* to control his pain.

74.     There were no additional medical concerns identified in the available investigation materials or in conversation with PITTS' sister.

75.     Due to officer oversight PITTS was not asked about the presence of any scars or tattoos. However, records reflect the defendant has the following tattoos: "Rayanna" on his chest; a tribal design on his left upper arm; and "Samuel" on his right upper arm.  There are no other identifying marks noted in the available investigation materials.

### Mental and Emotional Health

76.     PITTS disavowed a history of mental or emotional health concerns. There were no issues identified in the available investigation materials or in conversation with the defendant's sister.

### Substance Abuse

77.     PITTS disavowed drinking alcohol or using any controlled narcotic substances.  He noted that his father "used to drink" and seeing how it affected his father, PITTS never imbibed.

78.     The undersigned notes that PITTS was found in possession of marijuana when arrested in the 2005 kidnapping case.  Further, in 2011 he was arrested for possession of marijuana and *Oxycodone* pills.  Otherwise there were no substance abuse concerns identified in the available investigation materials.  Ms. Pitts disavowed knowledge of the defendant drinking in excess or using any controlled narcotic substances.

### Educational, Vocational and Special Skills

79.     PITTS attended Hoover High School in San Diego.  He discontinued his studies following his junior year noting, "I chose to work instead."  Correspondence from Hoover High School shows that the defendant enrolled on September 20, 1983, as a freshman and left following his sophomore year.  The defendant left because he "moved to HSDP (Adult Ed)."  No further information was provided.

80.     In 1984 PITTS attended American Business College in San Diego, an auto mechanics trade school, for six months.   He did not complete the program noting, "It wasn't for me."  This school has since closed and could not be verified.

81.     In his free time the defendant enjoys reading and watching television.

### Employment Record

82.     The defendant is unemployed and unable to work due to his ongoing medical issues. He is financially supported by his family, girlfriend, and with the assistance of public aid. He receives $300 a month in General Relief and $149 a month in food stamps. In the future he plans to seek Supplemental Security Income (SSI).

83.     From approximately July to October 2016, PITTS was employed as a plumber's helper with Best Plumbing and Drains in San Diego. He was paid cash for his labor and left the job after he was laid off.  The undersigned notes that during the November 30, 2016, telephone conversation with QUARLES, PITTS informed that he was terminated following an altercation with another employee.  During the probation interview the defendant did not recall this altercation.

84.     In late 2015 the defendant worked for seven months as a laborer with a man who was remodeling a house.  PITTS met this man at a Home Depot store and was paid cash for his labor.

85.     In the past the defendant worked various warehouse jobs obtained through temporary staffing agencies.  He was unable to recall the dates of these jobs or the names of his employers.

### Financial Condition: Ability to Pay

86.     PITTS is unemployed due to his ongoing medical issues.  He is financially supported by family, his girlfriend, and with the assistance of public aid.  He reported no monthly expenses or assets.  He owes approximately $50,000 in medical bills.

87.     The defendant has minimal income and a negative net worth.  In considering the financial information available, it does not appear the defendant currently has, or will have in the near future, the ability to pay a fine in this case.

## PART D. SENTENCING OPTIONS

**The guideline options are advisory pursuant to <u>United States v. Booker</u>.**

### Custody

88.     **Statutory Provisions:**  The maximum term of imprisonment is four years. 21 U.S.C. § 843(d).

89.     **Guideline Provisions:** Based upon a total offense level of 27 and a Criminal History Category IV, the guideline imprisonment range is 100 months to 125 months. However, the statutorily authorized maximum sentence of four years is less than the minimum of the applicable guideline range; therefore, the guideline term of imprisonment is 48 months. USSG §5G1.1(a)

### Supervised Release

90.     **Statutory Provisions:**  The Court may impose a term of supervised release of not more than one year. 18 U.S.C. § 3583(b)(3).

91.     **Guideline Provisions:**  Since the offense is a Class E Felony, the guideline range for a term of supervised release is one year. USSG §5D1.2(a)(3).

### Probation

92.     **Statutory Provisions:**  The defendant is eligible for not less than one nor more than five years' probation because the offense is a Class E Felony. 18 U.S.C. § 3561(c)(1). One of the following must be imposed as a condition of probation unless extraordinary circumstances exist: a fine, restitution, or community service.

93.     **Guideline Provisions:** Since the applicable guideline range is in Zone D of the Sentencing Table, the defendant is ineligible for probation. USSG §5B1.1, comment. (n.2).

### Fines

94.     **Statutory Provisions:**  The maximum fine is $250,000. 18 U.S.C. § 3571(b).

95.   **Guideline Provisions:** The fine range for this offense is from $25,000 to $250,000. USSG §5E1.2(c)(3).

**Impact of Plea Agreement**

96.   Based on the written plea agreement, the parties have agreed to the following advisory guideline calculations:

|   |   |   |
|---|---|---|
| 1. | Base Offense Level, USSG §§ 2D1.6 and 2D1.1 | 24 |
| 2. | Minor Role, USSG § 3B1.2(b) | -2 |
| 3. | Acceptance of Responsibility, USSG § 3E1.1 | -3 |
| 4. | Appeal Waiver/Early Resolution, USSG § 5K2.0 | -2 |

97.   There is no agreement as to the defendant's criminal history category.

98.   The government will recommend that the defendant be sentenced to 24 months in custody.

99.   The defendant may request additional adjustments, departures, and sentence reductions under 18 U.S.C. § 3553; the government may oppose any such requests.

## PART E. FACTORS THAT MAY WARRANT DEPARTURE

100.  Pursuant to USSG § 5K2.0, a downward departure may be considered for a combination of factors based on mitigating circumstances in the defendant's life.  Per the plea agreement, the parties have agreed to a two-level reduction for a combination of circumstances to account for the defendant's early resolution and appellate waiver.  In that this agreement is between the parties as part of plea negotiations, the appropriateness of this departure is deferred to the court.

## PART F. FACTORS THAT MAY WARRANT A SENTENCE OUTSIDE OF THE ADVISORY GUIDELINE SYSTEM

101.  When fashioning a sentencing recommendation, the factors listed at 18 U.S.C. § 3553(a) must be considered in order to make sure the sentence imposed is sufficient, but not greater than necessary.

102.  The nature and characteristics of the offense are of a serious nature and PITTS must be held accountable for his actions.  However, the undersigned notes that it appears the defendant was a peripheral participant in the overall conspiracy.  His involvement is limited to a narcotic transaction in which he was handed the profits and two telephone calls in which he discussed purchasing a small amount of marijuana and disclosed that he was selling his pain medication for profit. While it is clear that PITTS made a poor decision with whom he chose to associate with, there is no information affirming that he himself was actively selling methamphetamine.  Still, he was present for the narcotic transaction and should be held accountable.

103.    In considering the history and characteristics of the defendant the undersigned notes that
        this is not his first involvement in the criminal justice system and his record consists of
        several convictions for violent offenses against women in his life.  This is obviously of
        concern.   In mitigation, PITTS described strong familial support and disavowed any
        substance abuse concerns.  He has on-going medical issues that have made him unable to
        work, but he is currently under the care of a doctor and stated plans to seek SSI.

104.    In considering all the facts present in this case the undersigned believes that the
        calculated range is excessive for this particular defendant. As such, a downward variance
        is deemed appropriate.  It is believed a sanction below the advisory guideline range will
        adequately address the goals of sentencing without creating an unwarranted sentencing
        disparity.

**PROBATION OFFICER'S ANALYSIS/JUSTIFICATION**

105.    **In analyzing this case and formulating a recommendation, the probation officer has
        considered the advisory sentencing guidelines and pertinent policy statement(s)
        issued by the Sentencing Commission in effect on the date of sentencing, along with
        the factors listed at 18 U.S.C. § 3553(a).**

106.    PITTS appears before the Court for sentencing after pleading guilty to unlawful use of a
        communication facility. During the course of the investigation, agents conducted
        surveillance on the defendant and the other indicted individuals as they conspired to
        distribute methamphetamine.  As for his role in the conspiracy, the defendant was present
        during a narcotic transaction between two other indicted individuals and agents
        intercepted telephone calls where he discussed purchasing and selling drugs.  Post-arrest
        and during the presentence interview, the defendant acknowledged his role in the
        conspiracy and attributed his involvement in this case to his poor peer associations.  He
        has accepted responsibility for his actions and expressed remorse for his behavior.

107.    The defendant has a lengthy criminal record and has sustained several convictions for a
        variety of offenses including: using offensive words in public, battery of a spouse (two
        cases), kidnapping, and inflicting corporal injury to a spouse or cohabitant.   The
        defendant has been sentenced to probation, county jail, and state prison, all of which
        failed to deter him from committing new offenses.  Further, the undersigned is concerned
        by his continued violence toward women. He has cases involving three separate victims.
        At the time of the offense herein PITTS was active state parole following a kidnapping
        conviction.  It is noted that the offense also involved the rape of the pregnant victim who,
        at the time, had an active restraining order against the defendant.  Nonetheless, those
        charges were dismissed as part of his plea.  Ultimately parole supervision was discharged
        without violation proceedings despite PITTS' arrest and prosecution in the case herein.

108.    The defendant described a satisfactory upbringing and has the support of his family who
        assisted with his bond.  He disavowed any substance abuse concerns.  Medically he
        suffers from Degenerative Disc Disease and recently underwent surgery to treat the
        condition. His on-going medical issues have prevented him from working and PITTS is
        supported by his family, girlfriend, and public aid.

109. During the probation interview PITTS stated that he was "embarrassed" by his actions and "let down myself and my family." He added, "I want to put this behind me and move on to something better. I am at the age that I want to relax and enjoy life and be free." It is hopeful the defendant is sincere in his statements and desire to change. Ultimately this change is a decision that only he can make.

110. Based on the probation officer's guideline calculations, the advisory guideline range is 100 to 125 months. However, the guideline range is limited by the statutory maximum sentence of 4 years. Accordingly, the guideline range becomes 48 months. Given the totality of circumstances, and the factors noted in Part F, it is believed that a slight variant sentence is justified. Accordingly, a sentence of 36 months custody is recommended. It is believed that this sentence is sufficient to serve as a deterrent and afford adequate punishment for the offense.

111. Following the defendant's release from custody, a one-year term of supervised release is recommended with the noted special conditions.

**SENTENCING RECOMMENDATION**

    <u>**Custody**</u>

112. <u>Statutory Maximum</u>:          4 years

113. <u>Guideline Range</u>:          48 months, USSG §5G1.1(a)

114. <u>Recommendation</u>:          36 months, 18 U.S.C. § 3553(a)

    <u>**Supervised Release**</u>

115. <u>Statutory Maximum</u>:          1 year

116. <u>Guideline Range</u>:          1 year

117. <u>Recommendation</u>:          1 year

    <u>**Recommended Conditions of Supervision**</u>

118. That the defendant abide by the mandatory and standard conditions of supervision and the following condition(s):

    1. Report all vehicles owned or operated, or in which you have an interest, to the probation officer.

    2. Submit your person, property, residence, office or vehicle to a search, conducted by a United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release; failure to submit to a search may be grounds for revocation; the

PITTS, Bradley Scott                                                                      22

defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition.

**Fine**

119.   Statutory Maximum:          $250,000

120.   Guideline Range:            $25,000 to $250,000

121.   Recommendation:             $0

       **Special Assessment**      $100


Respectfully Submitted,

DAVID J. SULTZBAUGH
CHIEF PROBATION OFFICER

By:   *Jessica C. Hood*

      Jessica C. Hood
      U.S. Probation Officer


Reviewed and Approved:

*David J. Mudd*

David J. Mudd
Supervising U.S. Probation Officer
December 4, 2017

PROB 2A SD

# SENTENCING SUMMARY CHART

USPO    x
AUSA
DEF

Defendant's Name: PITTS, Bradley Scott      Docket no.    3:17CR01028-025-BTM

Guideline Manual Used:    November 1, 2016      Agree with USPO Calculations:
USSG § 2D1.6 and USSG §
2D1.1(c)(5), 55.2 gr. of Meth.

Base Offense Level:    (Drug Quantity, if Applicable:    (actual)      )      30

Specific Offense Characteristics: _____

_____

_____

_____

Victim Related Adjustment: _____

Adjustment for Role in the Offense:    0

Adjustment for Obstruction of Justice: _____

Adjustment for Reckless Endangerment During Flight: _____

Adjusted Offense Level:    30

☐ Combined (Multiple Counts)    ☐ Career Offender    ☐ Armed Career Criminal

Adjustment for Acceptance of Responsibility:    -3

Total Offense Level:    27

Criminal History Score:    8

Criminal History Category:    IV

☐ Career Offender      ☐ Armed Career Criminal

Guideline Range:      from    48

(Range limited by:    ☐ minimum mandatory    ☒ stat maximum)      to    48   mths

Departures:   None

_____    _____

_____    _____

_____    _____

_____

Resulting Guideline Range:      from _____

to _____ mths